IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   No. 09-20396-Ma/P |
| **UNDRA WILLIAMS,** | ) |
| | ) |
| Defendant. | ) |

_____

REPORT AND RECOMMENDATION
_____

Before the court by order of reference is defendant Undra Williams's Motion to Suppress. (D.E. 66.) Pursuant to the order of reference, the court conducted a suppression hearing. At the hearing, the court heard testimony from three government witnesses: Memphis Police Department ("MPD") Sergeant Joseph Johnson, MPD Officer Frank Amato, and Walter Lee Chalmers. The court also heard testimony from Undra Williams. The court admitted into evidence six photographs of the parking lot where Williams encountered the police.

Based on the briefs filed in support of and in opposition to the motion and the evidence presented at the suppression hearing, the court submits the following proposed findings of fact and conclusions of law, and recommends that the Motion to Suppress be denied.

I.   PROPOSED FINDINGS OF FACT

As an initial matter, the court finds the testimony of Sergeant Johnson and Officer Amato to be credible and believable, and therefore the proposed findings of fact are based on these witnesses' testimony. The officers appeared to have a clear recollection of the events in question and their testimony was consistent in all material respects. The court finds the testimony of Chalmers, at least as it relates to his encounter and interaction with Sergeant Johnson, to be credible.[1] The court further finds the testimony of Williams, which conflicts with the officers' and Chalmers's testimony, to be not credible.

At approximately 1:00 a.m. on May 23, 2009, Sergeant Joseph Johnson and Officer Frank Amato were on uniform patrol at Club Senses, a nightclub in Memphis, Tennessee. The officers were working a vehicle burglary detail in the club's parking lot in response to recent reports of vehicle break-ins at the club. Sergeant Johnson and Officer Amato were each patrolling the lot alone in separate patrol cars. During the patrol, Sergeant Johnson observed a vehicle backed into a parking space next to a trash dumpster. The vehicle had its headlights on and was parked away from the club's front entrance. Sergeant Johnson observed two

---

[1] In assessing Chalmers's credibility, the court takes into account his multiple prior felony convictions, including his convictions for burglary and theft, and his testimony that he was not completely truthful in his statement to the police officers after his arrest on May 23, 2009.

black males sitting in the front seat, who were later identified as Walter Lee Chalmers (the driver) and Undra Williams (the front seat passenger).

Sergeant Johnson pulled his patrol car in front of the parked vehicle at a 90 degree angle. Sergeant Johnson's vehicle did not block in the parked vehicle.[2] Although Sergeant Johnson had his alley lights on, he did not activate his blue lights or sirens. He exited his patrol car and approached the driver's side of the parked vehicle, without drawing his weapon. As he approached the vehicle, he noticed that the two men were "shuffling around" and they appeared to be "moving stuff" near the front floorboard area. Sergeant Johnson noticed that the men wore t-shirts and jeans, appeared "unkempt," and did not look like they were dressed to go to the nightclub. Sergeant Johnson asked the men what they were doing. As he was talking with the men, Sergeant Johnson shined his flashlight into the car and observed DVD monitors and stereo equipment on the floorboard on the front passenger side. The equipment had exposed wires and were not in boxes. Sergeant Johnson was aware that stereo and video equipment were the type of

---

[2]Although Sergeant Johnson did not recall exactly how far his patrol car was parked in front of the parked vehicle, Officer Amato testified that when he arrived on the scene, Sergeant Johnson's vehicle was parked at an "L" angle to the parked vehicle and that Sergeant Johnson's vehicle was not blocking the parked vehicle. Similarly, Chalmers testified that Sergeant Johnson's vehicle was not blocking his vehicle and that he (Chalmers) "could have pulled off if [he] wanted."

items that had been recently stolen from vehicles in the club's parking lot.[3]  Sergeant Johnson then called in the license plate number of Chalmers's vehicle and discovered it was expired and belonged to a different vehicle.  Upon learning this information, Sergeant Johnson asked Chalmers for his driver's license.  Chalmers told Sergeant Johnson that his license was suspended.  Sergeant Johnson then asked Chalmers to exit the vehicle, and Chalmers complied.  When Chalmers opened the driver's side door, Sergeant Johnson observed a pair of gloves, a flashlight, and a screwdriver near his driver's seat.  Sergeant Johnson recognized these items as tools commonly used in vehicle burglaries.

Sergeant Johnson called for assistance, and within a matter of minutes, Officer Amato arrived on the scene.  Sergeant Johnson told Officer Amato that Chalmers had a suspended license and asked Officer Amato to get Williams out of the vehicle.  Officer Amato testified that although he did not have any reason to believe that Williams was armed or dangerous, he conducted a pat down frisk of Williams because he does that whenever "we make an encounter."  Officer Amato frisked Williams and discovered a screwdriver in Williams's pants pocket.  The officers then placed Chalmers and Williams into separate patrol cars as they continued their

---

[3]According to Chalmers, he was giving Williams a ride home from the nightclub and apparently did not know what items Williams had at his feet.  The court finds this part of Chalmers's testimony to be not credible.

investigation.[4]  Sergeant Johnson, Officer Amato, and other officers who by this time had arrived on the scene drove around the parking lot and discovered that several vehicles had been burglarized.  The officers ran the license plates of these vehicles and were able to locate the club patrons who owned the vehicles.  The vehicle owners informed the officers that the damage to their vehicles was "fresh," and one owner identified the DVD monitors found in Chalmers's vehicle as being monitors stolen from his vehicle.

Officer Amato then returned to his patrol car, at which time he noticed Williams moving around excessively in the back seat.  Officer Amato opened the back door and observed a handgun on the floorboard next to Williams's feet.  Officer Amato removed Williams from the vehicle and retrieved the gun.  Officer Amato then conducted a search of Williams's person and discovered several bullets in his pants pocket.[5]  Williams was subsequently indicted

---

[4]Officer Amato testified that even if he had not found the screwdriver, he would have detained Williams in his patrol car until the officers were able to complete their burglary investigation.

[5]Williams testified that Sergeant Johnson pulled in front of Chalmers's vehicle in a "T" formation (not an "L" formation), which prevented Chalmers's vehicle from leaving.  He also testified that Sergeant Johnson used his intercom and ordered Chalmers and Williams not to move when he first approached the vehicle.  As mentioned earlier, the court finds Williams's testimony to be not credible.  In addition to the fact that his testimony conflicts with the credible testimony of the officers, Williams has multiple prior felony convictions for burglary, including a conviction for burglary of a vehicle.

for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).

## II.  PROPOSED CONCLUSIONS OF LAW

In his Motion to Suppress, Williams argues that all evidence seized by the police officers should be suppressed because the officers conducted an unlawful vehicle stop without reasonable suspicion.  The court disagrees.

The Sixth Circuit has explained that there are three types of encounters between police officers and citizens:  "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause."  United States v. Gross, 624 F.3d 309, 314-15 (6th Cir. 2010), as amended, United States v. Gross, No. 08-4051 (6th Cir. June 15, 2011) (quoting United States v. Waldon, 206 F.3d 597, 602 (6th Cir. 2000)).  "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).  "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to

decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 439 (1991); see also Michigan v. Chesternut, 486 U.S. 567, 573-74 (1988) (stating that an individual is seized if "a reasonable person would have believed that he was not free to leave" and noting that the test is an objective one) (internal quotation marks omitted).

"[A] consensual encounter does not amount to a seizure." United States v. Campbell, 486 F.3d 949, 954 (6th Cir. 2007). As the Supreme Court explained in Florida v. Royer, 460 U.S. 491 (1983):

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention – no seizure within the meaning of the Fourth Amendment – then no constitutional rights have been infringed.

Id. at 497 (citations omitted); see also Campbell, 486 F.3d at 954 (quoting Royer). "In short, because a consensual encounter does not amount to a seizure, a police officer does not need reasonable suspicion or probable cause before approaching an individual to

-7-

make an inquiry." Campbell, 486 F.3d at 954 (citing United States v. Alston, 375 F.3d 408, 411 (6th Cir. 2004)).

"A seizure of an individual, on the other hand, occurs when 'under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away.'" Id. (quoting Alston, 375 F.3d at 411). "The police officer's subjective intent in detaining an individual is irrelevant so long as that intent is not conveyed to the individual in a way that results in the individual believing that he or she is not free to leave." Id. (citing United States v. Mendenhall, 446 U.S. 544, 554 n. 6 (1980)). "'Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" Id. (quoting Mendenhall, 446 U.S. at 554). "Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a Terry stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." Id.

In the present case, the initial encounter between Sergeant Johnson, Chalmers, and Williams was a consensual encounter.

-8-

Sergeant Johnson approached Chalmers's vehicle by himself.  He did not block in Chalmers's vehicle, draw his weapon, activate his blue lights or sirens, use his intercom or bullhorn, make any threats, raise his voice, give any orders, or restrain the occupants in any way.[6]  Sergeant Johnson asked what the men were doing, engaged them in conversation, and looked inside the vehicle with his flashlight.  This level of police intrusion does not amount to a seizure.

Eventually, however, Sergeant Johnson ran the vehicle's license plate information and asked Chalmers for his driver's license – the type of information officers typically check during a traffic stop.  It was at this point the consensual encounter escalated to an investigative detention.  See Brendlin v. California, 551 U.S. 249, 257 (2007) (holding that a vehicle passenger is seized within the meaning of the Fourth Amendment when a police officer makes a traffic stop; "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much

---

[6]Williams relies on United States v. See, 574 F.3d 309 (6th Cir. 2009) and Gross in support of his argument that Sergeant Johnson conducted a Terry stop when he initially approached Chalmers's vehicle.  In those cases, however, the court found that the officers conducted a Terry stop when they used their police vehicles to block in the defendants' vehicles, thus preventing the defendants from driving away.  In this case, Sergeant Johnson did not block in Chalmers's vehicle, and even Chalmers testified that Sergeant Johnson's vehicle was not positioned in such a way that would have prevented him from driving off.  As the court noted in See, the officer "could have properly sought a consensual encounter without blocking See's ability to exit, and such a consensual encounter would not have run afoul of Terry."  See, 574 F.3d at 314 n.4.

as it halts the driver"). When evaluating the constitutionality of a Terry detention, the court engages in a two-part analysis. First, it asks whether there was a proper basis for the detention, which is judged by examining whether the police officers were aware of specific and articulable facts which gave rise to reasonable suspicion. Second, the determination is made whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officers' conduct given their suspicions and the surrounding environment and circumstances. United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006).

The court finds that, based on the totality of the circumstances, the officers had reasonable suspicion to detain Williams while they conducted their burglary investigation. It was 1:00 a.m. and the officers were working a vehicle burglary detail specifically in response to recent reports of vehicle break-ins at the club. Chalmers's vehicle was parked next to a trash dumpster and away from the club's front entrance. As Sergeant Johnson approached the vehicle, he saw the men "shuffling around" and appear to be "moving stuff" near the front floorboard area. The men wore t-shirts and jeans, appeared "unkempt," and did not look like they were dressed to go to the club. Sergeant Johnson saw in plain view DVD monitors and stereo equipment with exposed wires next to Williams's feet, and he recognized the equipment as being

the type of items that had been recently stolen from vehicles in the club's parking lot. Based on this information, the officers had reasonable suspicion of criminal activity.

Second, the court finds that the degree of intrusion was reasonably related in scope to the situation at hand. Based on his suspicion of criminal activity, it was reasonable for Sergeant Johnson to check Chalmers's identification and vehicle information, which was minimally intrusive. When Chalmers stepped out of his car, Sergeant Johnson saw a pair of gloves, a flashlight, and a screwdriver, which provided him with additional articulable facts to detain Chalmers and Williams and to conduct a further investigation. It was also reasonable for the officers to place Williams in the back seat of Officer Amato's patrol car, as the officers needed to secure Williams (and Chalmers) while they drove around the parking lot checking for burglarized vehicles and locating the vehicles' owners. The act of placing Williams in the patrol car did not transform the investigative detention into an arrest, especially in light of the fact that he was not questioned while detained in the patrol car.[7] See United States v. Boyett,

---

[7]The officers were never asked during the suppression hearing whether Williams was handcuffed when he was placed in Officer Amato's vehicle. However, even if Williams had been handcuffed, his placement in the police vehicle did not transform the investigative detention into an arrest. He was not questioned by the police, and it is apparent that the purpose of putting Williams and Chalmers in the patrol cars was to secure them while the officers drove around the parking lot looking for burglarized vehicles.

295 F. App'x 781, 785 (6th Cir. 2008) (stating that placing a suspect in a squad car can be justified in order to secure the scene, particularly when the police do not question the suspect while in the squad car); Caruthers, 458 F.3d at 469 (finding no arrest where defendants were placed in a patrol car while police searched for weapons because defendants were not subjected to police interrogation while confined in the patrol car); United States v. Jacob, 377 F.3d 573, 580 (6th Cir. 2004) (holding it was not unreasonable for police to handcuff and place defendants in the patrol car because, among other things, the police needed to secure and control the scene of the stop and police did not use the confinement to question the defendants); United States v. Hood, No. 92-5112, 1992 WL 322373, at *4 (6th Cir. Nov. 5, 1992) (finding no arrest where defendants were placed in the back of a locked patrol car where the defendants were not handcuffed, were not confined in the patrol cars for the purposes of interrogation, the stop did not involve multiple patrol cars or officers, and the stop did not last any longer than necessary to effectuate the purpose of the stop); United States v. Anderson, No. 2:08-CR-25, 2008 WL 4739534, at *6 (W.D. Mich. Oct. 24, 2008) ("Placement in a patrol car during an investigatory detention does not turn an investigatory detention immediately into an arrest.").

Once the officers discovered that several vehicles had been burglarized and found one vehicle owner who claimed ownership of

the DVD monitors found in Chalmers's vehicle, the officers had probable cause to arrest Williams for burglary of a vehicle, a Class E Felony. See Tenn. Code Ann. 39-14-402(a)(4). Based on the lawful arrest of Williams, Officer Amato was permitted to search Williams's person and the area within his immediate control. See United States v. Guy, 1 F. App'x 410, 412 (6th Cir. 2001) (citing Chimel v. California, 395 U.S. 752, 762-63 (1969)); Walker v. Wuis, No. 1:10-CV-553, 2011 WL 2066604, at *5 (W.D. Mich. May 25, 2011). Under the search-incident-to-arrest exception, Officer Amato's seizure of the firearm from the back seat of his patrol car and bullets from Williams's pants pocket was lawful.

In addition, Officer Amato was justified in seizing the firearm because the weapon, which was in plain view, posed an immediate threat to officer safety. See United States v. Bishop, 338 F.3d 623, 628 (6th Cir. 2003) (holding that "officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety"). Once Officer Amato saw the gun, he had a reasonable belief that Williams was armed and dangerous, and therefore he was permitted to conduct another safety frisk for weapons and was justified in seizing the ammunition found

in Williams's pants pocket.[8]

### III.  CONCLUSION

For the reasons above, the court recommends that the Motion to Suppress be denied.

Respectfully submitted,

                          s/ Tu M. Pham
                          _____
                          TU M. PHAM
                          UNITED STATES MAGISTRATE JUDGE

                          August 7, 2011
                          _____
                          DATE

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**

---

[8]The court notes that Officer Amato's initial safety frisk of Williams conducted prior to putting him into his patrol car was done without any reasonable belief that Williams was armed or dangerous. See United States v. Johnson, 401 F. App'x 25, 28-29 (6th Cir. 2010).  It is unclear whether the government intends to admit the screwdriver that was retrieved by Officer Amato as evidence in its case-in-chief, and it is unclear whether Williams seeks to suppress the seizure of that screwdriver.  However, even if Williams seeks suppression of this evidence, the court finds that the screwdriver would have been "inevitably discovered" by Officer Amato when he conducted his search-incident-to-arrest. See United States v. Howard, 621, F.3d 433, 451 (6th Cir. 2010) (discussing inevitable discovery doctrine).